IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| LEANORA CARUTH, <br><br> *Plaintiffs*, <br><br> v. <br><br> C. BENSON CLARK D.D.S., <br> d/b/a KING CENTRE DENTAL and <br><br> DR. C BENSON CLARK, D.D.S. <br><br> *Defendants*. | Civil No. 1:16-cv-149 <br><br> Hon. Liam O'Grady |

## MEMORANDUM OPINION

Plaintiff Leonora Caruth has sued Dr. C. Benson Clark and his dental practice, King Centre Dental ("Defendants") for breach of contract and various torts relating to her dental treatment between 2011 and 2014. After receiving treatment from Dr. Clark, Ms. Caruth eventually abandoned Dr. Clark's practice and went to a different provider who determined it was necessary to replace all of Ms. Caruth's teeth and consequently remove all of Dr. Clark's work. Following this series of events, Ms. Caruth brought claims for: (1) medical negligence; (2) battery; (3) breach of contract; (4) fraud; and (5) a violation of the Virginia Consumer Protection Act (VCPA). Defendants have moved for Summary Judgment on all claims. (Dkt. No. 34). The parties fully briefed the matter and the Court heard oral argument on March 24, 2017. For the reasons that follow, the Court hereby **GRANTS** summary judgment as to the VCPA claims, but **DENIES** the motion in all other respects.

1

# I. BACKGROUND

In May 2011, Plaintiff went to see Dr. Adrian Wilson for advice about her dental treatment options after her braces were removed. Plaintiff was concerned that, once the upper and lower braces were off, she might need additional work to ensure that the teeth stayed in place. Dr. Wilson recommended that Plaintiff go see Dr. Clark for an opinion on treatment options. Dr. Clark is a general dentist who specializes in implants. On Dr. Wilson's advice, Plaintiff first visited Dr. Clark on June 17, 2011.

### A. Initial Visit on June 17, 2011

At the initial consultation on June 17, 2011 Dr. Clark recommended implants, "although there was some discussion of partial dentures and bridges" as well. It is undisputed that Dr. Clark did not provide any formal written treatment plan during this first visit. The best evidence of the treatment plan is a 2008 image of Plaintiff's mouth with some handwritten notes on it. Defs.' Mem. in Supp., Ex. F-3 (Dkt. No. 35-4). Beyond that, the parties dispute the scope of the agreed-upon treatment. Nonetheless, they seem to agree that some of the work would focus on Tooth 21, which was the anchor for a bridge is Ms. Caruth's mouth at the time of the visit. Ms. Caruth alleges that Dr. Clark told her the entire treatment (the scope of which is disputed) would cost $24,000, and she therefore obtained a loan for that amount from a company called CareCredit.

### B. First Treatment Visit on June 21, 2011

Ms. Caruth received her first treatment from Dr. Clark on June 21, 2011. During this visit, Dr. Clark removed an old bridge that encompassed Tooth 21. Dr. Clark asserts that, once the bridge was removed, it became clear that Tooth 21 was compromised and that a new crown would not provide sufficient support for a new bridge across Teeth 18-21. At that time, Dr.

Clark determined that he would have to remove Tooth 21 and replace it with an implant. Ms. Caruth challenges whether removal of Tooth 21 was necessary. She suggests that Dr. Clark's financial problems give the jury enough information to believe that Dr. Clark unnecessarily removed the tooth at a cost of $5,920 rather than charging $900 for the crown.

The parties further dispute the extent of the discussion that happened before the tooth removal. Ms. Caruth stated that, after she was numbed, Dr. Clark told her "he has to take out the tooth, and he took out the tooth." Ms. Caruth was charged an additional $5,300 or $5,800 (beyond the original $24,000) for this visit. Ms. Caruth spoke with Ms. Franklin (an employee at Dr. Clark's office) about the bill, but did not protest at that time.

### C. Subsequent Issues and Charges

Ms. Caruth alleges the following issues that arose after this initial visit: (1) the implant on Tooth 21 needed to be "re-installed" or replaced in or around November 2011 and again in or around February 2012; (2) Ms. Caruth's temporary crowns were deteriorating, chipping, breaking, and falling out of place; (3) Ms. Caruth's tooth enamel and gum health was deteriorating; (4) on September 15, Dr. Wilson informed her that her mouth was in "a state of disrepair."

Ms. Caruth was charged a total of $22,773 above and beyond the $24,000 that was initially agreed upon. That figure breaks down to: (1) $5,300 on June 21, 2011; (2) $2,100 on October 22, 2012, which was reduced to $638; (3) $14,835, reduced to $6,835 on April 10, 2013; (4) $10,000 on June 26, 2013. Of these additional charges, Ms. Caruth only actually paid $5,511 beyond the initial $24,000. Throughout the course of her treatment, Dr. Clark asserts that there is an array of services for which Ms. Caruth was not charged. All told, these "service discounts and office adjustments" totaled $12,884.

3

### D. New Treatment Plan and Involvement of Other Dentists

On July 9, 2012, Ms. Caruth endorsed a new treatment plan that included TENSing and electromyography to fix her bite. The cost of this new treatment plan is unclear. On October 12, Ms. Caruth enlisted the help of her previous dentist, Dr. Wilson, to address a billing issue. Dr. Wilson, Ms. Caruth, and Dr. Clark then all met together to discuss the bill, and Dr. Clark reduced a $2,100 bill to $638. On September 10, 2013, Ms. Caruth again enlisted the help of her dentists at Connecticut Avenue Dental, who telephoned Dr. Clark to discuss his treatment plan, the expected date of completion, and billing.

### E. The February 4, 2014 Proposed Final Restoration

Nearly all of the facts surrounding the proposed restoration are in dispute. Most prominently, the parties dispute both the quality and the value of the work performed on Ms. Caruth prior to February 4, 2014. This includes a dispute over whether the bite work was "complete" and when and how the billing discussions took place.

Defendants contend that Ms. Caruth's bite work was complete and she was ready for permanent restorations or permanent crowns. They further contend that Ms. Spriggs—the front office administrator at Clark Dental—informed Ms. Caruth that the work was estimated at $47,600. When Ms. Caruth stated that she would not pay that amount, Dr. Clark offered to complete the work for $20,000. After Ms. Caruth refused to pay that amount as well, Dr. Clark offered to do the work at no charge.

Ms. Caruth's version of the story is different. She states that, prior to her final visit on February 17, 2014, she was told that she would not incur additional charges to have the work completed. It was not until she was at the office, in the dental chair, with her teeth numbed, that

Dr. Clark said there was a "mistake" regarding the prior representation that he would do the work for free. At that time, Ms. Franklin came into the room and advised Ms. Clark that she could either pay $49,000 for permanent porcelain crowns or $34,000 for dentures. The parties agree that Ms. Clark did not receive permanent restorative treatment from Dr. Clark. Instead, she went to Clear Choice, who removed all of her existing teeth and all Dr. Clark's dental work, and placed implants in her entire mouth.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment has the initial burden of showing the court the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact. *Id.* Once the moving party satisfies its initial burden, the opposing party has the burden of showing, by means of affidavits or other verified evidence, that there exists a genuine dispute of material fact. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see also Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) ("To avoid summary judgment, the non-moving party's evidence must be of sufficient quantity as to establish a genuine issue of material fact for trial.") (emphasis removed). A dispute of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, "[f]anciful inferences and bald speculations of the sort no rational trier of fact could draw or engage in at trial need not be drawn or engaged in at summary judgment." *Clinchfield Coal Co.*, 124 F.3d at 640. To defeat a summary judgment motion, the existence of specific material evidentiary facts must be shown. *Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411–412 (4th Cir. 1986).

### III. DISCUSSION

The Court finds that the fraud, battery, medical negligence, and breach of contract claims all present questions of material fact. They therefore cannot be resolved on the instant motion for summary judgment. The VCPA claim, however, presents a discrete legal question that is ripe for resolution at this time. The question appears to be one of first impression. Namely, does the VCPA apply to the billing practices of dentists, or does Section 59.1-199(A) of the Virginia Code ("Exclusion A") exclude Plaintiff's VCPA claims? After considering the parties' arguments and the relevant caselaw, the Court concludes that Exclusion A applies, and it therefore **GRANTS** summary judgment in favor of Defendants on Count V. Because the parties dispute the application of the Virginia Medical Malpractice Act ("VMMA") to this case, a brief discussion of the Act follows the Court's VCPA analysis.

#### A. <u>The Virginia Consumer Protection Act</u>

The VCPA makes it unlawful for a supplier to, *inter alia*, use "any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code § 59-1-200(14). In order to prove a violation of the VCPA, a plaintiff must show: (1) fraud; (2) by a supplier; (3) in a consumer transaction. *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 741 (E.D. Va. 2010).

6

1. *Fraud Analysis*

Because the VCPA claim necessarily depends on the underlying fraud claim, it is necessary to briefly outline Plaintiff's theory of fraud. In Virginia, the elements of fraud are: (1) a false representation of material fact; (2) made intentionally and knowingly; (3) with intent to mislead; (4) reliance by the party mislead; and (5) resulting damage to the party misled. *Elliott v. Shore Stop, Inc.*, 238 Va. 237 (1989).

The main substantive dispute at this stage is whether Dr. Clark made materially false statements that induced Ms. Caruth to enter into the contract for dental care. This issue toes the line between "a statement that is false when made (which is fraud) and a statement that becomes false only when the promisor later fails to keep his word (which is a breach of contract)." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 631 n.9 (4th Cir. 1999); *see also* Order Granting Motion for Reconsideration, *Lapham v. Trolley Pub*, Civ. No. 16-cv-369 (E.D. Va. Feb. 9, 2017) (O'Grady, J.). The key question, therefore, is whether there is sufficient evidence to suggest that Dr. Clark knew that his statements were false when he made them to Ms. Caruth, or whether his actions amounted to a "negligent breach of contract," that came about as a result of future circumstances. Defs.' Mem. in Supp. at 17; *see Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 560 (1998) (requiring some evidence that defendant "did not intend to fulfill its contractual duties at the time it entered into the [contract]").

Ms. Caruth's theory of fraud boils down to the allegation that Dr. Clark told her he could perform all of the necessary work for $24,000 when he knew that the actual costs would be much more. She further asserts that Dr. Clark intended to charge her for extra work once he got her to obtain the $24,000 loan that committed her to his practice. In support of this theory, Ms. Caruth

7

cites the following pieces of evidence: (1) Dr. Clark knew the cost of crowns was not included in the estimate; (2) Dr. Clark knew the bite adjustment and stabilization was not included in the estimate; (3) Dr. Clark knew the actual charges for the crowns was $1,700 rather than the promised $900; (4) Dr. Clark states that he was not providing Ms. Caruth with his own advice as though she was his patient, but was instead making decisions based on the representations of Dr. Wilson; (5) Dr. Clark admits that a reasonable treatment plan would have cost between $36,000 and $90,000; (6) Dr. Clark's business was in dire financial straits; and (7) Dr. Clark did not provide a written treatment plan, which allowed him to continue to charge Ms. Caruth for new services with impunity.[1]

The factual context of dentistry services ultimately carries the day for Ms. Caruth's fraud claim at this stage of the litigation. In particular, there is an imbalance of power between patient and doctor that the Court must consider here. When getting a new dentist, there are some initial transactional costs that might prevent a patient from switching providers mid-treatment. Most importantly, there is a requisite level of trust necessary to begin a relationship with an individual who will eventually affect a patient's bodily health, structure and integrity. Indeed, there is a unique personal relationship with one's doctor or dentist; so much so that these interests are recognized in HIPAA and other aspects of federal and state codes governing patient rights. Moreover, there are hard transactional costs that come with the insurance forms, initial

---

[1] Ms. Caruth also bases her VCPA and fraud claims on a statement on Dr. Clark's website that Dr. Clark "has placed over 15,000 implants in a 35 year period with a 97% success rate." Compl. ¶ 84. She alleges that this is false based on information and belief, and on the "exceptionally poor quality of Dr. Clark's work." Id. ¶ 85. There is nothing in the record to support the assertion that this is false. Indeed, Ms. Caruth does not even argue that her own implant was unsuccessful. Although this implant needed to be replaced or re-inserted on two occasions, there is no factual support for the notion that Dr. Clark did not eventually complete the implants with an appropriate degree of professional success. Moreover, even if this could be seen as a failure, there is a dearth of evidence that would suggest Ms. Clark was not simply in the 3% of unsuccessful cases. Finally, even if Dr. Clark's statement was false, Ms. Caruth admits that she went to Dr. Clark on the advice of Dr. Wilson, and therefore it is not plausible that she relied on the statements on Dr. Clark's website. As such, this evidence does not support a cognizable theory of fraud.

screenings, record transfers, and potential x-rays that accompany the process of switching dentists. On the facts of this case, a reasonable fact-finder could determine that these factors provided an additional incentive for Dr. Clark to misrepresent his initial promises in order to induce Ms. Caruth to become his patient because he knew that switching would be difficult once she had committed to him.

This version of the story is further enhanced by the expertise required in any medical profession. To a large degree, patients must rely on the medical opinions of their health care providers. They may not know the difference between implants or crowns, or between porcelain and other materials. Though it is sometimes prudent to obtain a second opinion, eventually a patient must rely on the training of her dentist. This is especially true in this case because Ms. Caruth committed $24,000 in loans to Dr. Clark before he even turned on a drill. Indeed, it appears Ms. Caruth could only pay her bills by virtue of the CareCredit loan. Thus, in many ways, after the June 17, 2011 meeting, she was committed to Dr. Clark's services—and his professional judgment—for the foreseeable future. In Ms. Caruth's version of the story, Dr. Clark knew this, and used it to "milk her mouth for all it was worth." Opp'n at 31.

The Court does not, and need not, make any final factual determinations as to Dr. Clark's intent. In addition, the Court does not make any findings regarding when Ms. Caruth should have discovered her fraud claim. *See* Va. Code § 8.01-249.1 (setting forth the standard for when fraud claims accrue for statute of limitations purposes). These questions are both reserved for the fact-finder. As such, summary judgment on the fraud claim is inappropriate at this time.

2.  *The VCPA Analysis*

Having established a factual question for the underlying fraud, the Court's analysis turns back to the VCPA. As is relevant for this case, the VCPA contains a carve-out exception, which

9

states that the provisions of the VCPA shall not apply to "[a]ny aspect of a consumer transaction which aspect is authorized under laws or regulations of this Commonwealth or the United States, or the formal advisory opinions of any regulatory body or official of this Commonwealth or the United States." Va. Code § 59.1-199(A).

The Virginia Supreme Court has held that Exemption A does not apply to a suit involving the fraudulent advertising practices of a licensed Virginia automobile dealer. *Manassas Autocars, Inc. v. Couth*, 274 Va. 82, 85 (2007). In *Couth*, the court rejected the notion that the general regulation of an industry meant that all aspects of that industry were "authorized" as that term is defined by the VCPA. *Id.* at 89. As such, it reinforced that Exception A "does not exempt entire industries from the Act, rather it exempts claims arising from certain transactions that are already covered by a Virginia or federal law." *Beaty v. Manor Care, Inc.*, No. 02-1720-A, 2003 WL 24902409, at *4 (E.D. Va. Feb. 10, 2003) (applying the VCPA to torts that occurred during a plaintiff's stay at an assisted living facility).

Under this line of reasoning, Virginia circuit courts have held that Exemption A does not apply where a health-care provider defendant fails to tell a patient "that he was being administered 'a knock-off drug . . . from a compounding pharmacy' and [misrepresented] the tainted steroid as one produced by FDA-regulated manufacturers." *Wingate v. Insight Health Corp.*, 87 Va. Cir. 227, 2013 WL 9564175 at *2 (2013) (quoting the complaint). In reaching its conclusion, the court recognized that the inquiry into whether defendants' actions were "authorized" could not "be narrowly restricted to the alleged misrepresentation, since no law would authorize misrepresentation." *Id.* at *6. In other words, "[t]he authorizing statute need not, of course, authorize misrepresentations—but it must at least address communications by practitioners to their patients in order to have an exclusionary effect in this case." *Id.* at *7.

10

Thus, despite the fact that the sale and manufacture of pharmaceuticals is highly regulated by the FDA, the court held that misrepresentations surrounding the advertising and sale of those drugs were not encompassed by Exception A. *Id.* at *2.

In a separate line of caselaw, at least two Virginia circuit courts have held that the VCPA does not apply to legal malpractice cases. *See Oberto v. Grogan*, 88 Va. Cir. 188, 2014 WL 8383045 at *2 (2014); *see also Condominium Unit Owners' Ass'n v. Crossland Savings FSB*, 15 Va. Cir. 239, 241 (1989). In support of this decision, however, the court in *Oberto* only cited the Virginia statute that generally authorizes the practice of law. *Oberto*, 2014 WL 8383045 at *2 (citing Va. Code § 54.1-3900). Though it was decided after *Couth*, the *Oberto* decision therefore stands in contrast with cases like *Wingate* which searched deep into the Virginia Code to find a specific statute that "authorized" the defendant's conduct. As such, it is possible to read *Oberto* for the proposition that the comprehensive licensing process for attorneys—which includes a written bar examination, continuing legal education requirements, the payment of fees and dues, and oversight by a disciplinary board (among other things)—is sufficient to establish that the provision of legal services is "authorized" by the laws of the Commonwealth as that term is defined in Exception A. *See id.*

Applying this law to the case at hand, the Court concludes that the VCPA is not applicable to Ms. Caruth's claim. As an initial matter, it is worth noting that the dental profession is regulated by an entire chapter in the Virginia Code. *See* Va. Code § 54.1-2700 *et seq.* The Code provides for a Board of Dentistry that has the expansive authority to, among other things: (1) establish qualifications for registration, licensure, or certification; (2) examine or cause to be examined applicants for certification or licensure by written exam or demonstration of manual skills; (3) levy and collect fees for various tasks associated with

administration and operation of the Board; (4) promote administrative regulations which are reasonable and necessary to manage the system of control and governance; and (5) take appropriate disciplinary action. *See* Va. Code § 54.1-2400.

This comprehensive scheme of authorization and regulation brings dentistry within the ambit of the ruling in *Oberto*. Just as the legal profession requires an applicant to pass a merits-based bar examination before being authorized to practice law, so too must an aspiring dentist sit for the National Board Dental Examination and pass a dental clinical competency examination before being "authorized" to practice dentistry. *See* 18 VAC 60-21-210. Dentists, lawyers, and other licensed professionals must do more than merely apply to the Commonwealth and pay a fee in order to obtain their licenses. They must instead study and pass a vigorous exam before they are "authorized" to practice their trade. Thus, these professions are distinguishable from a car dealership or a nursing home based on the skill involved in the authorization process. *See* Va. Code § 46.2-1581 (regulating advertising practices surrounding the sale of automobiles).

Moreover, the Virginia Board of Dentistry's specific regulations address the claims in this case. *See Wingate*, 2013 WL 9564175 at *2. As discussed above, Ms. Caruth's theory of fraud relates to her initial discussions with Dr. Clark regarding the scope, cost, and nature of her dental treatment. This interaction is governed by 18 V.A.C. 60-21-50, which states:

> A dentist shall only treat based on a bona fide dentist-patient relationship for medicinal or therapeutic purposes within the course of his professional practice consistent with the definition of dentistry in § 54.1-2700 of the Code . . . A bona fide dentist-patient relationship is established when examination and diagnosis of a patient is initiated.

The entire premise of Ms. Caruth's claim revolves around when the dentist-patient relationship was established and what induced her to enter that relationship. As such, the administrative regulation governing that relationship further brings this case within the ambit of Exception A.

12

Most importantly, however, the interaction between Ms. Caruth and Dr. Clark is addressed specifically by 18 V.A.C. 60-21-60, which states that:

> B. A dentist is responsible for conducting his financial responsibilities to patients and third party payers in an ethical and honest manner by:
>
> 1. Maintaining a listing of customary fees and representing all fees being charged clearly and accurately.
>
> 2. Making a full and fair disclosure to his patient of all terms and considerations before entering into a payment agreement for services.
>
> 3. Not obtaining, attempting to obtain, or cooperating with others in obtaining payment for services by misrepresenting procedures performed, dates of service, or status of treatment.
>
> 4. Making a full and fair disclosure to his patient of any financial incentives he received for promoting or selling products.
>
> 5. Not exploiting the dentist-patient relationship for personal gain related in nondental transactions.

These administrative provisions are precisely on point, and they dictate the conclusion that the financial aspects of Dr. Clark's business are unequivocally "authorized" and regulated by the Virginia Board of Dentistry. This finding brings Count V within the language of Exception A and outside the purview of the VCPA.

### B. Application of the Virginia Medical Malpractice Act

The parties disagree about whether the Virginia Medical Malpractice Act ("VMMA") applies to this case. Specifically, their arguments are framed with regard to whether the VMMA "preempts" any of Ms. Caruth's claims. *See* Opp'n at 22; Defs.' Reply in Supp. at 3. This is not the proper inquiry. The VMMA provides a set of rules that govern malpractice claims; it does not determine "when the patient has a cause of action—*an entirely separate issue.*" *Simpson v. Roberts*, 287 Va. 34, 45 (2014) (McClanahan, J., concurring) (emphasis added); *see also* Va. Code § 8.01-581.1 (defining malpractice as "any *tort action or breach of contract action* for

personal injuries or wrongful death, based on health care or professional services rendered . . .") (emphasis added). Thus, the application of the VMMA necessarily presumes an underlying cause of action before the Court can consider whether or not the Act applies.

The rules outlined in the VMMA include: (1) a statutory damages cap of $750,000; (2) a provision restricting recovery for attorney's fees and costs; (3) a pre-filing notice requirement; and (4) the requirement of expert testimony to prove certain claims. *See* Va. Code § 8.01-581.1 *et seq.*; *see also Beverly Enterprises-Virginia v. Nichols*, 247 Va. 264, 267 (1994) (stating that expert testimony is "ordinarily necessary" to prove a malpractice claim); *but see Mayr v. Osborne*, 795 S.E.2d 731, 735 (2017) (highlighting that battery claims are separate from malpractice claims and do not require expert testimony).

The parties do not identify which of these procedural rules they believe are relevant for the purposes of Counts I-IV. Therefore, the Court is unable to either grant or deny any specific relief based on Defendants' Motion for Summary Judgment. For the purposes of clarity, the Court hereby holds that the battery claim may proceed as a technical battery, but it does not make any additional legal conclusions regarding the application of the VMMA. *See Mayr*, 795 S.E.2d at 735 (holding that when the factual question is one of the patient's consent, the claim must proceed as a battery). The parties may raise the issue again on a motion in limine if they seek to exclude specific evidence or if the VMMA otherwise becomes relevant. *See Alcoy v. Valley Nursing Homes, Inc.*, 272 Va. 37 (2006) (deciding the VMMA issue on a motion in limine).

## V. CONCLUSION

In sum, Defendants concede that the contract claim and the malpractice claim should survive summary judgment. Similarly, both the fraud and the battery claims present issues of

14

material fact that cannot be resolved at this stage of the litigation. The VCPA claim, however, cannot survive as a matter of law because Exception A applies. As such, Defendants' motion is **GRANTED** with respect to Count V, but **DENIED** in all other respects. An appropriate order shall issue.

April 1 2, 2017
Alexandria, Virginia

Liam O'Grady
United States District Judge